ZULA V. GALLAHER ET AL. *v.* TRUSTEES OF THE CHERRY HILL METHODIST EPISCOPAL CHURCH OF CHERRY HILL, INCORPORATED

[No. 659, September Term, 1978.]

*Decided April 12, 1979.*

The cause was argued before THOMPSON, MOORE and MACDANIEL, JJ.

*David H. Parrack,* with whom were *Bratton, Clower & Parrack* on the brief, for appellants.

*O. Robert Lidums* for appellees.

MOORE, J., delivered the opinion of the Court.

Because the trustees of a church cemetery inadvertently assigned the same burial plot to two different families, this appeal is before us. At issue is whether the chancellor correctly held that the widow of the second purchaser was required to disinter her husband's remains.[1] We are unable to conclude that there was error.

## I

In the distant past, The Cherry Hill Methodist Episcopal Church of Cherry Hill, Elkton, Maryland, devoted a portion of its property to cemetery use. About seventy years ago, Lot 4, Row H, containing four spaces, was acquired by Mrs. Koelig, the mother of one of the respondents below, J. Oliver Koelig. She purchased it for $12 and was given a handwritten receipt. Some time in the 1930's, Mrs. Koelig informed her son that the lot would be his provided he assumed the cost for perpetual care and cornerstones. On July 22, 1945, the son entered into a perpetual care agreement with the Trustees of the Church, in consideration of a payment of $50. According

---

1. In the most recent decision of the Court of Appeals on the subject of sepulture, the appeal was from a decree *denying* a widow the right to disinter her husband. Dougherty v. Mercantile-Safe Deposit and Trust Company, 282 Md. 617, 387 A. 2d 244 (1978). The facts and circumstances there are quite dissimilar.

to Mr. Koelig, now 65, his mother is deceased and is buried in Newark, Delaware. The record does not disclose Mr. Koelig's place of residence but he testified that annually, at Eastertime, he made visits to the graves of his grandparents, aunts, uncles and cousins at Cherry Hill, and also viewed the gravesite he had acquired through his mother. "It is all of our relatives right around that circle," he testified, "all of the Jaquettes. My mother was a Jaquette from Elkton." At some point in time, four metal markers with the letter "K" were installed.

Precisely how the appellants in this case could have acquired the same four spaces, is shrouded in mystery. The fact of the matter is, however, that a mistake was made some time before the year 1960, when The Honorable H. Kenneth Mackey, now a member of the Circuit Court for Cecil County, became secretary of the Board of Trustees and the Trustee primarily responsible for the cemetery. When he assumed that position, an undated map of the cemetery showed the lot in controversy to be available for sale. This was erroneous. Mr. Koelig had never resold the lot to the Trustees, as the bylaws required, in the event of the relinquishment of a burial place. The origin of the error could not be explained.

Another of the respondents below, Ella Cato, the sister of Robert Gallaher, while on jury duty in the Circuit Court for Cecil County, in November 1974, expressed her interest in the acquisition of a burial lot to Judge Mackey's secretary, Mrs. Joy. The latter handled the sales and transfers of cemetery lots which averaged between six to ten per year. Joy exhibited to Cato a map of the cemetery. If a space had been sold, the owner's name was printed on the map; if no name appeared on a particular lot, it was for sale. The space representing Lot 4, Row H was blank. Mrs. Joy informed Mrs. Cato that a family named Koelig had previously owned the lot but since the space on the map was blank they must have transferred it back to the cemetery.

Mrs. Cato made a $100 down payment toward the purchase of the south one-half of Lot 4, Row H, consisting of two burial spaces. She testified that she selected this particular lot because it was in close proximity to the graves of her

grandparents, father, and two brothers. Her mother, she said, was also to be buried in the same cemetery but the site was not disclosed. The record does not disclose whether she was still married at the time of the proceedings below nor the existence of any children. Mrs. Cato made periodic payments toward the purchase price and received a deed for the lot on February 5, 1976.

Several days after her original purchase in 1974, Mrs. Cato's brother, Robert Gallaher, purchased the north one-half of Lot 4, Row H, consisting of the remaining two spaces. He also purchased three other spaces elsewhere in the cemetery. In August 1976, Robert Gallaher died. His widow, the appellant Zula V. Gallaher, testified that at the time of his death the funeral director, Donald Hicks, who was also a member of the Board of Trustees of the Church and in charge of the cemetery, was informed of the Gallahers' burial rights in the north one-half section of Lot 4, Row H; and Mr. Gallaher was interred in one of the two spaces. Mrs. Cato testified that she had been in communication with Mr. Hicks shortly after the purchase of the lot when she discovered, on a visit to the cemetery, that there were cornerstones on the outer boundaries with the initial "K." Mr. Hicks informed her at that time that they were the cornerstones of the former owners by the name of Koelig and that he would have them removed. It does not appear, from the record, that this was done.

During his Easter visit to the cemetery in 1977, Mr. Koelig discovered the interment. Understandably disturbed, he communicated with Mrs. Gallaher and her sister-in-law, Mrs. Cato, and requested that the remains of Mr. Gallaher be removed. When they refused, he conferred with Judge Mackey. The Trustees subsequently made compromise offers to both the appellants and Mr. Koelig of similar burial plots or, in the alternative, monetary settlements. In the case of Mrs. Gallaher, the proposed settlement included the payment of all expenses in connection with her husband's disinterment and reburial. The offers were not accepted.

Unable to resolve the unfortunate impasse, the Trustees filed a declaratory judgment action, in equity, in the Circuit

Court for Cecil County. It was prayed that the court declare, "which of the Respondents has the right and privilege to use Lot 4, Row H for burial purposes and . . . the rights and duties of each of the parties. . . ." The named respondents were Mrs. Cato and Mrs. Gallaher and Mr. J. Oliver Koelig.

The petition came on for hearing before Judge K. Thomas Everngam of the Circuit Court for Caroline County, specially assigned. Testimony was received from the respondents and from Judge Mackey and Mr. Hicks. Subsequently, the court filed a comprehensive Memorandum Opinion and Order "granting the declaratory judgment and other relief." After a discussion and analysis of the facts and the applicable law, the court concluded that "a reason of substance," in the words of Mr. Justice Cardozo, in *Yome v. Gorman,* 152 N. E. 126, 129 (N. Y. 1926), required the disinterment of Mr. Gallaher's body and its removal to a new location. The court also concluded that the respondent, Mr. Koelig, was the "legal and equitable owner of the subject lot for burial purposes."

In his Order, the chancellor specifically held that: (1) Mr. Koelig was "entitled to the full and free use and occupancy of the entire Lot No. 4, in Row H . . . subject to the benefit, limitations and restrictions contained in the receipts and deed"; and that the Trustees should execute and deliver a confirmatory deed to him; (2) Mrs. Cato and Mrs. Gallaher had no legal or equitable interest in the lot and were "directed to remove or cause to be removed the vault in one of said grave spaces (which contains the casket and body of Robert Gallaher) within thirty days" of the final order; and that the cemetery deeds to them were "null and void"; (3) the Trustees of the Church were to offer to respondents, Cato and Gallaher, "comparable burial spaces in any unsold part of said Cherry Hill Cemetery of their choice without further charge"; (4) payment by the Trustees of "all reasonable expenses for opening and closing the old and new graves, the disinterment, moving, reinterment, and any other reasonable expenses connected with [the] removal of the vault containing the remains of Robert Gallaher"; and (5) payments in the sum of $250 each by the Trustees to Mr. Koelig and, jointly, to Mrs.

Cato and Mrs. Gallaher" as damages or recompense for their loss, inconvenience, expense and solace on account of this unfortunate occurrence." It was also ordered that the court would retain jurisdiction of the proceedings and that if any supplemental relief should become necessary, the court could consider and deal with it under the authority of Md. [Cts. & Jud. Proc.] Code Ann. § 3-412 (1974).

Following entry of the above Order, appellants Cato and Gallaher filed a petition for rehearing. Judge Everngam promptly heard the petitioners on June 22, 1978. No additional testimony was offered.[2] The court, however, heard further argument from counsel and, with commendable diligence, filed a supplemental Opinion and Order on June 26, 1978. The request for a change in the original adjudication dated May 31, 1978 was denied. In his supplemental opinion, the chancellor explained in the following language why no alteration of his original determination of the controversy was indicated:

"We believe that we came to the proper decision in our original Memorandum. We believe also we are as sensitive as any person 'to all those promptings and emotions that men and women hold for sacred in the disposition of the dead.' Yome v. Gorman, Supra. We agree as was stated in Currier v. Woodlawn Cemetery (Court of Appeals of New York), 90 N.E.(2d) 18, 21 A.L.R.(2d) 465 (1949) that 'the quiet of the grave, the repose of the dead, are not lightly to be disturbed. Good and substantial reasons must be shown before disinterment is to be sanctioned.'

However, (under the particular facts of this case) where Mrs. Koelig purchased this lot almost 60 years ago (February 1909) and her son J. Oliver Koelig beginning in 1945 paid for perpetual care and in 1948 paid for and placed four cornerstones to mark the boundaries of the lot, and continuously through the

---

2. Pertinent parts of the testimony of Mrs. Cato were, however, read at the court's instance by the court reporter.

past several decades the mother and son visited the burial lot regularly and correctly relied on their four written receipts as evidence of title, and have done nothing to create the wrongful recent resale of their lot or the resulting mistaken burial of a stranger therein, we believe that equity should not vitiate all that and strip them of their title and use of the burial lot. There must be some stability of title to a burial lot in these circumstances. The Koeligs (mother and son) have been diligent in protecting their rights and not guilty of laches. We feel under the circumstances that the removal of the unopened vault and casket containing the body of Mr. Gallaher (recently interred) to another lot will not be unduly insensitive or violative of the sentiment of all civilized people regarding the resting place of the dead as hallowed ground nor of the proper respect with which we all hold the same.

While we have no indication that Mrs. Cato and Mrs. Gallaher will want to do otherwise than to choose another lot in this pleasant country church cemetery in which to reinter the body, if they should elect to want to purchase a similar burial lot and reinter the body in another cemetery at the reasonable cost of the Trustees, this can be readily accomplished. . . ."

## II

Appellants' sole contention on appeal is that the chancellor erred "in refusing to apply the doctrine of bona fide purchaser" to the facts presented.[3] This case is one of first

---

3. This doctrine, not defined in appellants' brief, is basically that "every reasonable intendment should be made to support the titles of bona fide purchasers of real property, and that no equity can be any stronger than that of a purchaser who has put himself in peril by purchasing a title for a valuable consideration without notice of any defect in it." 77 Am.Jur.2d, *Vendor and Purchaser* § 633 (1975). This protection would extend to a legal interest in real property such as an easement. *See* 2 Thompson, *Real Property* § 426 (1961); *Annot.,* 124 A.L.R. 1254 (1940).

impression in Maryland and, in our judgment, even if that doctrine were applicable under the facts of this case — a question we do not decide — the adoption of such a principle would constitute too simplistic a solution to a sensitive and complex problem. Furthermore, it would establish, by judicial fiat, a rule which is unsupported in principle or authority.

At the outset, we note that the purchaser of a cemetery lot does not acquire a fee simple interest. Rather, he obtains a qualified property right or estate that is more in the nature of an easement, license, or privilege for the exclusive use of the lot for burial purposes so long as the property remains a cemetery.[4] As Judge Prescott stated for the Court of Appeals in *Diffendall v. Diffendall,* 239 Md. 32, 36, 209 A. 2d 914 (1965):

> "*[T]hrough the ages, all civilized peoples have considered the final resting place of their dead as hallowed and sacred ground.* Hence the Courts and legislative bodies have almost universally recognized that the 'property' or 'estate' which one acquires when he purchases a cemetery lot or a crypt is a 'qualified' property or estate. It is generally referred to, even though conveyed by a deed absolute in form, as an easement, privilege, or license for the sole purpose of sepulture as long as the property remains a cemetery. *Partridge v. First Ind. Church,* 39 Md. 631; *Rayner v. Nugent,* 60 Md. 515. And such estates are generally not held for the purpose of barter or sale; consequently, they seldom

---

4. Terry v. Elmwood Cemetery, 307 F. Supp. 369, 374 (N.D. Ala. 1969); Smith and Gaston Funeral Directors, Inc. v. Dean, 80 So. 2d 227, 230-31 (Ala. 1955); Mannheimer v. Wolff, 187 N.E.2d 1, 4 (Ill. App. Ct. 1962); Brunton v. Roberts, 97 S.W.2d 413, 415 (Ky. Ct. App. 1936); Diffendall v. Diffendall, 239 Md. 32, 36, 209 A. 2d 914 (1965); Partridge v. First Independent Church, 39 Md. 631, 637 (1874); German Evangelical St. Marcus Congregation v. Archambault, 404 S.W.2d 705, 707 (Mo. 1966); Billings v. Paine, 319 S.W.2d 653, 656-57 (Mo. 1959); City of New York v. Washington Cemetery, 188 N.Y.S.2d 52, 54 (S. Ct. 1959); Evergreen-Washelli Memorial Park Co. v. Dept. of Revenue, 574 P. 2d 735, 736-37 (Wash. 1978); 1 Thompson, *Real Property* § 7 (1964); 3 Tiffany, *The Law of Real Property* § 774 (1939); 14 Am.Jur.2d *Cemeteries* § 25 (1964); 14 C.J.S. *Cemeteries* § 25 (1939).

Once there is an interment on a lot, it becomes inalienable except by specific devise. Saulia v. Saulia, 302 N.Y.S.2d 775 (1969). In Re Turkish's Estate, 265 N.Y.S.2d 888, 889 (Surr.Ct. 1965).

have any commercial connotation." (Emphasis added.)

There is universal recognition of a principle which proceeds from Judge Prescott's above emphasized premise, "that the repose of the departed, [is] not lightly to be disturbed." *Currier v. Woodlawn Cemetery,* 90 N.E.2d 18, 19 (N. Y. 1949). Hence, it is essential to distinguish between controversies over ownership or rights of burial in ground not containing any mortal remains and those where interment has occurred. In the first situation, the question of title and ownership may be of signal importance. Indeed, there is a persuasive suggestion from an authoritative source that title may be the *sole* consideration. *Evergreen Cemetery Association, Inc. v. Jurgensen,* 309 N.Y.S.2d 847, 849 (App. Div. 1970). However, where disinterment of a body is at issue, equitable procedures and principles necessarily come into play and "the effect of legal title is merely a reason to be considered by the Court." *Id.* The protective power of a court of equity is essential to achieve a proper balance of the considerations, usually delicate, affecting controversies between proponents and opponents of disinterment. *Unterstitzung Verein v. Posner,* 176 Md. 332, 4 A. 2d 743 (1939); Annot. 21 A.L.R.2d 472, 483 (1952).

The case of *King v. Frame,* 216 N. W. 630 (Iowa 1927), upon which appellants place reliance for the adoption of the bona fide purchaser doctrine, is strikingly similar on its facts to the instant case but it simply does not support appellants' position. There, as here, an individual purchased a cemetery lot which, unknown to her, was already owned by another living person. She thereafter buried her husband in the lot. There were no markings nor any record of current ownership by the first owners, even though a State statute required such records.[5] Although the court cast the "second owner" in the

---

5. Maryland has no statute requiring the recordation of cemetery plots or the sales and transfers of individual lots. This statutory absence is not unusual. Because the conveyance of a cemetery lot is a rather unique property interest, many statutes do not adhere to the formalities of deeds and recordation. In Maryland, pursuant to Md. Ann. Code art. 23, § 165 (1973), "[a] certification [of ownership of a lot or crypt] under the seal of the cemetery or mausoleum corporation ... [has] the same effect as ... [an] executed, acknowledged, or recorded" real estate conveyance. *See* Md. Ann.

role of a bona fide purchaser, it is abundantly clear from the court's opinion that it felt impelled to apply general equitable principles in resolving the controversy. Framing the issue in its opinion, the court said:

"The question therefore is whether *in equity,* in the light of all of these circumstances, the plaintiff was entitled to the relief granted him by the district court [disinterment]. We are disposed to hold that he was not." (Emphasis added.)

*Id.* at 632. And at the conclusion of the opinion, the court stated:

"Taking all of these matters into consideration, we conclude that the *equities of the case are with the defendant* and that the body of John Elder should not be removed from said lot. 'Let it rest in peace.' " (Emphasis added.)

*Id.* at 633.

We think it is apparent that while considerations of title — and therefore of the rights of a bona fide purchaser — are important, they are not the controlling factor to be considered in reaching a fair resolution of a controversy between claimants asserting burial rights in the same plot after a deceased relative has already been interred. If, as appellants contend, that doctrine should be held to be determinative, equitable considerations involved in the principle of preserving the repose of the dead and respecting the religious beliefs and sensibilities of the living, would be negated. Indeed, inequity would result in a case like the present if the first owner — rather than the second — had been the first

Code art. 23, § 164 (Supp. 1978) (lots held for individual use not subject to debts of debtors); Diffendall v. Diffendall, 239 Md. 32, 36, 209 A. 2d 914 (1965) (cemetery lots seldom have commercial connotation and are not subject to debts of debtor); Billings v. Paine, 319 S.W.2d 653, 658 (Mo. 1959) (instrument conveying cemetery lot need not comply with formalities of a real estate deed); Saulia v. Saulia, 302 N.Y.S.2d 775, 779 (N.Y. 1969) ("the ordinary concepts of title, ownership, and devolution of title applicable to real property do not apply to cemetery plots"); Hughes v. Harden, 151 P. 2d 425, 427 (Okla. 1944) (oral permission sufficient to confer right to exclusive possession). *See also* 14 C.J.S. *Cemeteries* § 25 (1939) (in absence of statute a deed conveying cemetery lot is not constructive notice).

to use the lot for an interment. Under the bona fide purchaser doctrine, the burial rights of the second owner could be paramount. Similarly, if interment had been made by neither party, equitable considerations might support the first owner but application of the doctrine would favor the second. In other words, the bona fide purchaser doctrine flatly applied could produce inequitable results.

We think the proper approach, in controversies between conflicting claimants to the same burial place, involving potential disinterment, is that reflected by the Court of Appeals of New York [6] in *Currier v. Woodlawn Cemetery,* 90 N.E.2d 18 (1949), where Judge Fuld wrote for the court:

> *"While the disposition of each case is dependent upon its own peculiar facts and circumstances and while no all-inclusive rule is possible, the courts, exercising a 'benevolent discretion,' will be sensitive 'to all those promptings and emotions that men and women hold for sacred in the disposition of their*

---

6. In a case where an appeal was taken from a judgment in favor of plaintiffs in an action to compel removal of bodies buried by mistake, the views of the Court of Appeals of Kentucky were expressed in the following language in Brunton v. Roberts, 97 S.W.2d 413 (Ky. 1936):

"The natural desire of most of us that there shall forever be an uninterrupted repose of our own bodies, and a considerate regard for the sensibilities, reverence, and love of the kindred and friends of the deceased, demand that sepulchers shall not be violated except for compelling reasons. These tender sentiments are instincts of humanity written deep in the hearts of men, and cannot be ignored. The aversion to disturbance of his remains — it being an ordinary practice of the times to transfer bones from graves to the charnelhouse — doubtless originated the choice by Shakespeare of his own epitaph:

"Good frend, for Jesus sake forbeare
To digg the dust encloased heare;
Bleste be the man that spares thes stones,
And curst be he that moves my bones."

These considerations are not without weight. But justice must rise above sentiment, and it is the duty of the courts to apply the law when it is invoked. The circumstances of the case seem to warrant its application, the feelings of the parties to the contrary notwithstanding. The appellees are entitled under the law, as we have shown, to have the bodies removed and the unfortunate mistake corrected."

*Id.* at 416.

*dead.'* Yome v. Gorman, supra, 242 N.Y. at page 402,
152 N.E. at page 128." (Emphasis added.)

*Id.* at 19.

Notwithstanding the limited scope of the issue raised by appellants, we feel there is properly before us the question whether the chancellor, having correctly applied the law, properly exercised his discretion in the adoption of the Order previously summarized. We do not say that our own determination of the controversy would have been the same. Neither, on the other hand, can we conclude that there was any abuse of discretion on the part of the lower court. It is readily apparent that the chancellor was profoundly impressed with the import of his decision, and its effect upon the sensibilities of the persons involved. From the recitals in his opinion and supplemental opinion, it is abundantly clear that the equities were found to lie with Mr. Koelig; that the Trustees of the Church cemetery were properly ordered to bear the financial responsibility for the unfortunate error; and that compassionate regard was shown for the widow and sister of Robert Gallaher. In addition to the provisions made for the appellants in the Order, the chancellor had ascertained, by a personal inspection, that alternative sites were available in both the old and new parts of the cemetery.

We cannot say that the decree entered by Judge Everngam was "clearly erroneous," or, indeed, that it was erroneous at all.

*Judgment affirmed; costs to be paid
by appellees.*