**In re MEMORIAL ESTATES, INC., Debtor.**

**CHICAGO BANK OF COMMERCE, Plaintiff,**

v.

**AMALGAMATED TRUST AND SAVINGS BANK, et al., Defendants.**

**Bankruptcy Nos. 85 C 3520, 85 C 8786, 86 C 7780, 87 C 3829, 83 B 1016 and 83 A 1119.**

United States District Court, N.D. Illinois, E.D.

Sept. 1, 1988.

Jeffrey R. Liebman, George Grumley, Marjorie E. McCollom, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff.

William L. Needler, William L. Needler & Assoc., Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

A bank holds a mortgage on a cemetery. The cemetery fails to make the mortgage payments and attempts to sell most of its assets, including "unused burial spaces," to a third party. The third party operates the cemetery, sells "unused burial spaces," and keeps the proceeds, claiming that the "unused burial spaces" are not covered by the bank's mortgage. The bank then brings an action in state court to foreclose on the cemetery. One can imagine a host of ghostly legal issues, but none arises in this case.

The central issue is whether the bank's mortgage covers the cemetery's "unused burial spaces." Soon after the bank brought the foreclosure action, the cemetery filed for bankruptcy, the foreclosure case was removed to federal court, and the third party filed affirmative defenses and counterclaims to the foreclosure action. The bankruptcy court held hearings on the bank's foreclosure action and on the third party's counterclaims, and pursuant to 28 U.S.C. § 157(c)(1) issued proposed findings of fact and conclusions of law to this Court. The bankruptcy court proposed that the bank's mortgage covered the "unused burial spaces," that the bank was entitled to foreclose its mortgage on the cemetery, and that the third party's counterclaims were without merit. The bankruptcy court also denied the third party's motion to recuse the bankruptcy judge for bias and denied a petition to intervene by a class of owners of mausoleum rights and a class of the cemetery's union employees.

The third party has now filed before this Court a motion to strike the bankruptcy court's proposed findings and conclusions, an appeal of the bankruptcy judge's refusal to recuse himself for bias, and specific objections to the proposed findings and conclusions. As part of the *de novo* review of the third party's specific objections under section 157(c)(1), this Court has held a hearing during which the parties clarified the record and submitted additional documentary and testimonial evidence. For the following reasons, the Court denies the third party's motion to strike the proposed findings and conclusions, affirms the bankruptcy judge's refusal to recuse himself for bias, grants in part and denies in part the specific objections to the proposed findings and conclusions, and herewith issues its own findings of fact and conclusions of law as follows.

### I. *Introduction*

The bank is the Chicago Bank of Commerce ("Bank"). The cemetery is Memorial Estates, Inc. ("Memorial Estates"). The third party is Cemco, Inc. ("Cemco"). On May 17, 1978, the Bank and Memorial Estates entered into a lending arrangement, the specific details of which will be set out later in this Court's detailed findings and conclusions. In simplified form, Memorial Estates executed an installment note ("Note") payable to bearer in the amount of $425,000; the Note was secured by a trust deed conveyance ("Trust Deed" or "mortgage"). The mortgage provided that to secure payment of the Note, Memorial Estates does "grant, remise, release, alien and convey" the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging ...". The Bank is the holder of the Note.

On November 15, 1981, Memorial Estates attempted to convey to Cemco most of its assets, including "the perpetual use and occupancy for exclusive burial rights" of a section in the cemetery referred to as the Garden of Devotion. The Bank did not approve the conveyance to Cemco, and Cemco did not make any payments under the Note. (The Note, secured by the Bank's mortgage, had been in default since April 2, 1981.)

On July 15, 1982, the Bank instituted a foreclosure action in the Circuit Court of Cook County against Memorial Estates, Cemco, and certain others claiming an interest in the cemetery property. Cemco resisted the foreclosure, taking the position that its property interest in the "unused burial spaces" was not real property and therefore was not subject to the Bank's mortgage. Alternatively, Cemco asserted

that, if its interest was real property, then the common law provides that Cemco takes the "unused burial spaces" free of the mortgage. The Bank quickly moved for the appointment of an equity receiver to operate the cemetery, sell burial spaces, and retain the proceeds pending the outcome of the foreclosure action. The state court judge concluded that the Bank would be entitled to a receiver under the particular circumstances[1] and announced that he would appoint one. Before the judge appointed the receiver, however, Memorial Estates filed a petition for bankruptcy, and the foreclosure suit was removed to the bankruptcy court as a "related" case pursuant to 28 U.S.C. § 1452 and § 1334.[2]

Pursuant to his authority under 28 U.S.C. § 157(c)(1), the bankruptcy judge held a hearing on the Bank's motion for appointment of an equity receiver. Section 157(c)(1) provides in relevant part:

1. A court will ordinarily appoint a receiver in equity at the request of a creditor to prevent a waste of assets that secure the creditor's loan. *See In re Memorial Estates, Inc.*, 797 F.2d 516, 518 (7th Cir.1986) (*citing 2 Story's Equity Jurisprudence* § 1145 (14th ed. Zyon, 1918)); *Kerr on the Law and Practice as to Receivers* 26–27 (14th ed. Walton, 1972).

2. 28 U.S.C. § 1452 provides in relevant part:
   *Removal of claims related to bankruptcy cases*
   (a) A party may remove any claim or cause of action in a civil action ... to the district court for the district where such action is pending, *if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.*
   *Id.* (emphasis added).
   28 U.S.C. § 1334 provides in relevant part:
   *Bankruptcy cases and proceedings*

   .    .    .    .    .

   (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in *or related to cases* under Title 11.
   *Id.* (emphasis added).
   28 U.S.C. § 157(a) provides in relevant part:
   *Procedures*
   (a) Each district court may provide that any or all cases under Title 11 and any or all proceedings arising under Title 11 or *related to a case under Title 11 shall be referred* to the bankruptcy judges for the district.
   *Id.* (emphasis added).

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is *otherwise related to a case under Title 11.* In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected.

*Id.* (emphasis added). After the hearing, the bankruptcy judge determined that an equity receiver should be appointed to operate the cemetery pending the outcome of the foreclosure action and, under section 157(c)(1), proposed to the district court that the equity receiver be appointed. The district court agreed, ordered the appointment of the receiver, and Cemco appealed to the Seventh Circuit.

In general, § 157(a) authorizes the district court to "refer" all cases and proceedings within the district court's § 1334(a) and (b) jurisdiction to the bankruptcy court of the district. Section 157(b)(1) and (c)(1) then confer jurisdiction on the bankruptcy judge in the referred proceedings and define the scope of the bankruptcy judge's authority in various types of the referred bankruptcy proceedings. The bankruptcy court's jurisdiction is entirely derivative through the district court's § 1334 powers and § 157(a) reference.

Under § 157, if a proceeding either (1) "arises under" Title 11 case, and (2) is a core proceeding within the meaning of § 157(b)(2), then § 157(b)(1) authorizes the bankruptcy judge both to hear and determine it, subject only to ordinary appellate review by the district court pursuant to 28 U.S.C. § 158. If, however, the proceeding is not a "core" proceeding but is "otherwise related to" a Title 11 case, then under § 157(c)(1) the bankruptcy judge nevertheless may "hear" it but is required to submit proposed findings of fact and conclusions of law to the district court. In such a proceeding, the district judge must enter any final order or judgment after *de novo* review of any specific and timely objections. If, despite the "related" noncore character of a proceeding, all of the parties consent, then the proceeding may be determined fully by the bankruptcy judge under § 157(c)(2) subject only to ordinary appellate review under § 158. For a good discussion of Bankruptcy Court jurisdiction, see 1 *Norton Bankruptcy Law and Practice* pt. 4, §§ 5.01–.33 (1987); 1 D. Cowans, *Cowans Bankruptcy Law and Practice* § 1–2 (1986).

In *In re Memorial Estates*, 797 F.2d 516 (7th Cir.1986), the Seventh Circuit affirmed the appointment of the equity receiver, stating:

> The appointment was a proper exercise of the district judge's equitable powers if there was a danger that Cemco would dissipate ("waste," in receivership parlance) assets out of which the bank is entitled to collect the money that Memorial Estates owes it. There was such a danger. *Cemco denies any obligation under the mortgage, and hence claims the right to keep selling off what the bank with much show of reason contends is its collateral, and to retain the proceeds.* To prevent dissipation of a security interest is ... a conventional function for a receiver.

*Id.* at 521 (emphasis added).

With the appointment of the receiver to operate the cemetery, the case proceeded in the bankruptcy court on the Bank's foreclosure action and on Cemco's counterclaims. On July 22, 1985, the bankruptcy judge conducted a trial on the Bank's foreclosure action, and on January 21, 1986, the bankruptcy judge conducted a trial on Cemco's counterclaims. Then on April 11, 1986, the bankruptcy judge issued a memorandum opinion that indicated he would propose to the district court that the Bank's mortgage covers the "unused burial spaces," that the Bank is entitled to foreclosure, and that Cemco's counterclaims be denied.

On June 6, 1986, nearly four months after the bankruptcy judge issued his memorandum opinion, Cemco filed a request that the bankruptcy judge disqualify himself for bias. The bankruptcy judge treated the request as a motion for disqualification, denied the motion on July 15, 1986, and denied Cemco's motion to reconsider on August 18, 1986.[3]

During the following six months, the bankruptcy court issued four separate sets of proposed findings and conclusions, each of which relates to a separate matter regarding the Bank's foreclosure and Cemco's counterclaims. On August 13, 1986, the bankruptcy court issued proposed findings and conclusions regarding the Bank's

3. In addition to filing a request that the bankruptcy judge disqualify himself for bias, Cemco also filed before this Court a motion to withdraw the reference pursuant to 28 U.S.C. § 157(d). Section 157(d) provides in relevant part:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.

Thus, under § 157(d), a motion to withdraw the reference will only be granted if it is timely and "for cause shown." *See generally* 1 Norton, *supra* note 2, § 35.35, at 187 (determining that "[t]he elements that will constitute 'cause' for withdrawal are not evident either from the statute or its legislative history" and discussing the relevant case law).

It is possible for a party to use a motion to withdraw the reference as a procedural alternative to a motion to recuse the bankruptcy judge for bias. There are advantages. As discussed, the motion to withdraw the reference is made to the district court; the motion to recuse the bankruptcy judge for bias is made to the bankruptcy judge—requiring "the judge to judge the judge." 1 D. Cowans, *supra* note 2, § 1.7, at 49 ("The practical difficulty is that to obtain recusal, one must ask the judge to judge the judge.").

In this case, Cemco has used both procedures. It has already brought a motion before this Court to withdraw the reference from the bankruptcy judge under § 157(d) and remand the case to state court under § 1452(b). In its motion, Cemco argued that the motion should be granted because the state court was the only court with subject matter jurisdiction over the Bank's foreclosure case. This Court rejected Cemco's argument, finding that the foreclosure case was a "related" proceeding under § 157(a). *In re Memorial Estates, Inc.*, No. 85 C 3520 (N.D.Ill. July 16, 1986) [available on WESTLAW, 1986 WL 22008] (LEXIS, Genfed library, Dist. ct. file) ("Although the scope of [§ 157(d)'s] 'for cause shown' language is not entirely clear, the Court finds that Cemco has failed to present sufficient reasons ... to support its motion to withdraw the reference ...".).

Cemco then filed a motion to reconsider, and in addition to arguing that its § 157(d) motion to withdraw was appropriate, Cemco also argued that this Court (and the bankruptcy court) was required to abstain from this "state law cause of action" pursuant to 28 U.S.C. § 1334(c)(2). In a memorandum opinion and order dated September 4, 1987, this Court denied Cemco's motion to reconsider and its motion to abstain under § 1334(c)(2). *In re Memorial Estates, Inc.*, No. 85 C 3520 N.D.Ill. Sept. 4, 1987 [available on WESTLAW, 1987 WL 16931] (LEXIS, Genfed library, Dist. file).

Cemco then filed an appeal to the Seventh Circuit. On January 11, 1988, the Seventh Circuit dismissed Cemco's appeal as an appeal of a nonfinal order. *In re Memorial Estates, Inc.*, 837 F.2d 762 (7th Cir.1988).

foreclosure and Cemco's counterclaims; on October 9, 1986, proposed findings and conclusions regarding the Bank's application to shorten the redemption period;[4] on October 9, 1986, proposed findings and conclusions regarding the Bank's application for the equity receiver to issue deeds to certain burial spaces; and on January 28, 1987, proposed findings and conclusions regarding FDIC's motion to require the equity receiver to issue deeds to other burial spaces and to other burial rights.

Cemco has now filed in this Court a motion to strike all of the proposed findings and conclusions, an appeal of the bankruptcy judge's refusal to recuse himself for bias, and specific objections to the proposed findings and conclusions.

## II. *Motion To Strike*

■ Cemco makes six separate arguments to support its motion to strike the bankruptcy judge's proposed findings and conclusions. First, Cemco argues that this Court should strike the proposed findings and conclusions because subject matter jurisdiction over the foreclosure proceeding is lodged in state court and not the federal courts. This Court disagrees. The Seventh Circuit's decision, *In re Memorial Estates*, 797 F.2d 516 (7th Cir.1986), (as well as this Court's various decisions, *see, e.g., In re Memorial Estates*, No. 85 C 3520 (N.D.Ill. July 16, 1986) (LEXIS, Genfed library, Dist. file), motion for reconsideration denied (Sept. 4, 1987)), concluded that this Court possesses proper jurisdiction. These decisions are binding as the law of the case, and therefore Cemco's first argument is foreclosed by these decisions. *See Soderbeck v. Burnett County*, 821 F.2d 446, 449–50 (7th Cir.1987) (good discussion of the law-of-the-case doctrine).

■ Even if the argument were not foreclosed, it is clear that this Court has juris-diction over the removed foreclosure action. As provided under 28 U.S.C. § 1334(b), the federal district courts have jurisdiction over noncore, "related cases" because of the relationship of such cases to the bankruptcy proceedings. *See, e.g., Williams v. Austrian*, 331 U.S. 642, 67 S.Ct. 1443, 91 L.Ed. 1718 (1947); *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (Congress, pursuant to plenary federal power over bankruptcy, may oust jurisdiction of state court over foreclosure of debtor's property); *Schumacher v. Beeler*, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934). Moreover, the plurality in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 72 n. 26, 102 S.Ct. 2858, 2872 n. 26, 73 L.Ed.2d 598 (1982), reaffirmed the principle that "related cases" may be adjudicated in federal district court (and that the bankruptcy court has jurisdiction to make recommendations to the district court). *See generally Welch v. Kennedy Piggly Wiggly Stores, Inc.*, 63 B.R. 888, 892 (W.D.Va.1986); *In re Price–Watson Co.*, 66 B.R. 144, 146–52 (Bkrtcy.S.D.Tex.1986); *In re Environmental Research & Dev.*, 46 B.R. 774, 778–80 (S.D.N.Y.1985).

■ As its second argument, Cemco contends that this Court should strike the proposed findings and conclusions because *Marathon* requires that only this Court (and not the bankruptcy court) can hear a "related" common law state court action. As discussed above, Cemco's reliance on *Marathon* is misplaced. The plurality decision in *Marathon* "establishes only that Congress may not vest in a *non-Article III Court* the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate re-

---

**4.** Neither party argued in the bankruptcy court (or this Court) that Paragraph 11 of the Trust Deed is relevant to the dispute over the length of the redemption period, and therefore the argument is waived. *See In re Muller*, 851 F.2d 916 (7th Cir.1988). Paragraph 11 provides in relevant part:

The mortgagor [Memorial Estates] hereby waives any and all rights of redemption from sale under any order or decree of foreclosure of this trust deed, and [sic] its own behalf and on behalf of each and every person, except decree or judgment creditors of the mortgagor, acquiring any interest in or title to the premises subsequent to the date of this trust deed.

view." *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 3334, 87 L.Ed.2d 409 (1985) (emphasis added). In reaction to *Marathon*, Congress amended the Bankruptcy Code and provided that bankruptcy courts do not have jurisdiction, without the consent of the parties, to issue final judgments, orders, or decrees in noncore, "related proceedings." 28 U.S.C. § 157(c)(1). Rather, under section 157(c)(1), the bankruptcy court has jurisdiction only to issue proposed findings and conclusions which are then subject to *de novo* review in the district court. The bankruptcy judge in this case has complied with the procedure set forth in section 157(c)(1).

■ As its third argument, Cemco contends that this Court should strike the proposed findings and conclusions because the bankruptcy judge held hearings without permitting certain classes to intervene. According to Cemco, there are two proper intervenors—a class of owners of mausoleum rights and burial rights, and a class of the cemetery's union employees—that are "indispensible parties because no foreclosure sale can be had until their rights are fully adjudicated." Cemco Reply to Motion to Strike at 6. Cemco argues that because the bankruptcy judge conducted the foreclosure proceedings without permitting these classes to intervene, the entire proceedings are void and the proposed findings and conclusions should be stricken.

Cemco made this argument to the bankruptcy court, and that court determined that the two classes were neither indispensable parties nor proper intervenors. The bankruptcy court found that Cemco failed to show how any rights of either of the classes would be affected by the Bank's foreclosure. The bankruptcy court made clear that the Bank's foreclosure action and Cemco's counterclaims would not in any way affect the rights of the class of union employees or the class of purchasers. *See* Proposed Findings and Conclusions dated August 13, 1986, Conclusion No. 12 ("[The foreclosure] includes only those Burial Spaces now allegedly held and owned by Cemco and does not effect [sic] any spaces which have been sold to bona fide purchasers for internment or to an eleemosynary or fraternal association for resale to its membership"). Cemco does not present any new argument to show that these classes are proper intervenors to the Bank's foreclosure action. The record and the bankruptcy judge's proposed findings and conclusions make clear that the Bank's foreclosure would not affect the rights of either class.

■ As its fourth argument, Cemco contends that this Court should strike the proposed findings and conclusions because the bankruptcy court failed to consider the issue of Cemco's exclusive right to the information contained in the cemetery records and books.[5] Cemco argues that "[i]t is an uncontroverted fact that Cemco owns the records and books of the cemetery," Cemco Mem. in Supp. at 11, and argues that it "needs these records and books to fulfill its merchandise obligations to customers [that apparently bought while Cemco was operating the cemetery]." *Id.* at 12.

It is not "an uncontroverted fact" that Cemco owns the records and books of the cemetery, or at least it is controverted whether Cemco owns the exclusive right to use the information contained in the cemetery's books and records. However, whether Cemco needs these books and records, and whether it has the right to the exclusive use of the information in the books and records, is irrelevant to the foreclosure proceedings. The bankruptcy court has found that Cemco's claim of ownership of the cemetery's books and records raises no defense to the foreclosure action.[6] This

---

5. The equity receiver has access to these books and records to run the cemetery pending the outcome of the foreclosure proceeding.

6. Transcript of Bankruptcy Proceedings (July 19, 1985), pp. 13–14:

> **THE COURT:** The only affirmative defense that I recall being discussed at these hearings

... has been the affirmative defense that the burial rights take precedence, loosely, take precedence over the mortgage.

> **MR. NEEDLER [counsel for Cemco]:** Now, we have discussed the books and records. I'm sure you will recall that. We've discussed that numerous times.

Court agrees and therefore finds that the bankruptcy judge's failure to consider and include the issue of Cemco's exclusive right to the information contained in the cemetery's books and records provides no basis for striking the proposed findings and conclusions.[7]

As its fifth argument, Cemco contends that this Court should strike the proposed findings and conclusions because they are written in such a way as to make it impossible for Cemco to make specific objections as required by section 157(c)(1). Cemco argues that it cannot specifically object to the proposed findings and conclusions because the bankruptcy judge incorporated four documents by reference and also incorporated by reference any findings of fact that are conclusions of law and any conclusions of law that are findings of fact.

> THE COURT: As a defense?
> MR. NEEDLER: As a defense. We own the books and records.
> THE COURT: I found that to be pure nonsense....

*See also* Transcript of Bankruptcy Proceedings (July 17, 1985), pp. 45–46:

> THE COURT: ... Now, see what I'm doing here today in taking this time is so that when we come in here on Monday, we won't extend this hearing on the question of foreclosure into collateral matters. Which can be heard at another time.
> The question is—let's suppose and only suppose that [the bank] proves up its case. He gets his decree of foreclosure. The next question that comes up is [the bank] says, or the trustee [in bankruptcy] says, I'm entitled to those books and records. They are a part of and necessary for the running and all the other things that go with it.
> I don't see, very frankly, that that has to be part of the decree. You can certainly proceed without that.
> Now, I have already entered an order permitting the receiver the examination of the books and records, is that not correct?
> MR. GRUMLY [sic] [correct spelling "GRUMLEY"] [counsel for the Bank]: That's correct, your Honor.
> THE COURT: Now, if the books and records may be owned, lock stock and barrel, by Cemco, does that in and of itself, for instance, prevent this Court from granting to the foreclosing party or the purchaser at the foreclosure sale the right to examine those books and records to protect the interests of the public?
> MR. GRUMLY: I think the Attorney General's office made a claim in their adversary— and maybe I'm wrong. You can correct me if

The Court finds that the proposed findings of fact and conclusions of law are not so lacking in detail that Cemco cannot comply with section 157(c)(1) and make specific objections. Although it would have been helpful to the Court to have more detailed proposed findings and conclusions, the findings and conclusions sufficiently detail the bankruptcy judge's recommendations.

■ Finally, as its sixth argument to strike the proposed findings and conclusions, Cemco contends that the bankruptcy judge was so biased against Cemco that the proposed findings and conclusions "are of no value or advice to this Court." *Id.* at 10. Cemco requests that this Court consider Cemco's appeal of the bankruptcy judge's refusal to disqualify himself on this motion to strike,[8] and argues that because

> I'm wrong—as to whether or not the physical books and records are owned, the information, as a matter, should be know [sic] to the public and the consumer.
> THE COURT: That's what we're really talking about.
> Now, isn't that an issue separate and apart from the foreclosure? Let me ask my amicus curiae here.
> MR. HEALY: I don't see that it's necessary to dispose of that issue to move on to the foreclosure.
> THE COURT: I agree. That will be held.

7. As already mentioned, this Court has held a hearing at which the parties clarified the record and submitted additional evidence limited to two of Cemco's specific objections to the proposed findings and conclusions. One of the objections involved Cemco's counterclaim that it owns the exclusive right to the information contained in the cemetery's books and records. The Court will address this issue in part III of this memorandum opinion and order dealing with Cemco's specific objections and will incorporate its ruling in part IV dealing with this Court's findings and conclusions.

8. Cemco argues that "[i]t is essential that this appeal [of the disqualification motion] be considered along with Cemco's Objections to Proposed Findings of Fact and Conclusions of Law, *since the record of that appeal and the briefs therein will illustrate how thoroughly biased and unfair the proceedings before [the bankruptcy judge] turned out to be.*" Cemco Mem. in Supp. to Motion to Strike at 8.

Cemco did not technically file a motion for recusal but instead filed a request in its objections to the proposed findings and conclusions

of the bankruptcy judge's bias this Court (or the state court) must hold a trial *de novo in extenso.*[9]

To support its claim that the bankruptcy judge was biased against it, Cemco focuses on one incident that it argues provoked the bankruptcy judge's "displeasure with counsel," and that the judge's displeasure "color[ed] all subsequent proceedings, including 'trial' on the [Bank's foreclosure]." *Id.* The incident involved a letter dated June 26, 1985, from Cemco's counsel to the Bank's counsel, with copies sent to the bankruptcy judge and to the bankruptcy trustee. In the letter, Cemco's counsel wrote, among other things, about its view of the bankruptcy judge's limited jurisdiction and the consequences to the bankruptcy judge for overstepping his limited jurisdiction. Counsel for Cemco wrote the following:

> As we have stated, we believe it is beyond the power of the bankruptcy court to issue a final order in a related case, especially with the irretrievable and sweeping effect of the one you have proposed. *You should not encourage [the bankruptcy judge] to issue such an order because it is possible that he could be held liable ... somewhere down the line.* He has only limited immunity and the company that has bonded the receiver would not be willing, in our opinion, to extend its protection to the Court. It

would contend, and we believe successfully, that the receiver had a right to rely on the order and that any fault is the Court's for issuing it.

Cemco Counsel's Letter, dated June 26, 1985 (emphasis added).

Now in its motion to strike, Cemco characterizes the statements in this letter as "point[ing] out in a casual way to [the bankruptcy judge] that he could not enter such an order in excess of his jurisdiction and that he could very well be liable for the entry of any such order." *Id.* at 10. Cemco claims that the purpose of the statements was "to prevent [the bankruptcy judge] from [incurring] the tragic personal consequences of entering final orders in related cases generally." *Id.* According to Cemco, however, the bankruptcy judge took these statements as an effort to intimidate him and thereafter developed a bias that colored the remaining proceedings. This bias, Cemco contends, requires disqualification.

Cemco's counsel was, of course, right in stating that the bankruptcy judge did not have jurisdiction to issue final orders in noncore, "related" cases, but he was wrong in stating that the judge would incur personal liability for damages suffered as a result of his erroneously entering a final order. *See Forrester v. White,* — U.S. —, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)

---

submitted by the Bank to the bankruptcy judge that the judge disqualify himself for bias. The bankruptcy judge treated the request as a motion for disqualification, and denied the motion on July 15, 1986, and the motion to reconsider on August 18, 1986.

In its motion to strike and in its appeal, Cemco argues that the bankruptcy judge mischaracterized its request as a motion for disqualification and instead should have treated the request as a motion to either withdraw the reference and send the motion to the district court for ruling under 28 U.S.C. § 157(d) or a motion to revise the proposed findings and conclusions. *See* Cemco Reply to Motion to Strike at 9–13 (motion to withdraw reference); Cemco Brief on Appeal at 19 (motion to revise the proposed findings and conclusions). As this Court's discussion makes clear, no matter how Cemco wishes the Court to characterize its motion before the bankruptcy court, this Court finds that the bankruptcy court did not have a bias or the appearance of bias to require disqualification,

withdrawal of the reference, or revision of the proposed findings and conclusions.

**9.** As already discussed, under § 157(c)(1), this Court can enter a judgment only after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which a party has timely and specifically objected. Section 157(c)(1) neither requires nor precludes new evidence, and it does not require a trial *de novo extenso.* If the district court finds in its *de novo* review that the record is unclear or incomplete and that additional evidence must be taken, the Court has discretion to order the parties to present the evidence to it directly or to refer the case back to the bankruptcy court. *In re Campbell,* 812 F.2d 1465 (4th Cir.1987); *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1210 (7th Cir.1984) (*De novo* review requires the district court to make an independent judgment of the issues); *In re Price-Watson Co.,* 66 B.R. 144, 147–52 (Bkrtcy.S. D.Tex.1986).

(judges have absolute immunity from liability in damages for their judicial decisions). Whether Cemco's counsel was right or wrong, however, is not relevant to whether the bankruptcy judge was required to recuse himself.

■ Cemco does not point to any statutory provision under which the bankruptcy judge would be required to disqualify himself (and as a consequence of which his proposed findings and conclusions would be stricken). It argues that the general disqualification statute, 28 U.S.C. § 455, does not apply to a bankruptcy judge presiding over a noncore, "related proceeding." Cemco's Brief on Appeal at 21 ("Section 455 does not apply to special masters performing advisory functions as adjuncts of the district court."); *see also id.* at 18. Instead, Cemco attempts to compare its request for disqualification to a motion to withdraw the reference under 28 U.S.C. § 157(d) and argues that the "reasons [for] withdrawal of the case [under § 157(d)] would be far broader than those permitted under ... § 455." *Id.; see supra* notes 3 and 8.

There are several problems with Cemco's argument. First, Bankruptcy Rule 5004 provides:

*Disqualification*

(a) *Disqualification of Judge.* A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case.

The Court finds that this Bankruptcy Rule (and therefore the general disqualification statute) applies to a bankruptcy judge presiding over a noncore, "related" proceeding. *See In re M. Ibrahim Khan, P.S.C.,* 751 F.2d 162, 164–65 (6th Cir.1984).

■ Second, this Court has already denied Cemco's motion to withdraw the reference because Cemco failed to show "cause" as required under section 157(d). *In re Memorial Estates, Inc.,* No. 85 C 3520 (N.D.Ill. July 16, 1986) [available on WESTLAW, 1986 WL 22008] (LEXIS, Genfed library, Dist. file); *see supra* note 3. Cemco apparently now attempts to reargue the motion to withdraw the reference, asserting that the bankruptcy judge's bias against Cemco is "cause" under section 157(d) (although not necessarily bias requiring disqualification under section 455). The motion to withdraw, however, is untimely. The bankruptcy judge has already tried the foreclosure case and Cemco's counterclaim and has issued his proposed findings and conclusions to this Court. *See In re Pioneer Dev. Corp.,* 47 B.R. 624 (Bankr.N.D.Ill.1985); *In re Delorean Motor Co.,* 49 B.R. 900 (Bankr.E.D.Mich. 1985).[10]

■ Third, the Court finds that on the facts of this case the reasons for withdrawal of the case under section 157(d) for "cause" based on bias are not broader than the reasons for disqualification under section 455. Section 455 provides in relevant part:

*Disqualification of Justice, Judge, or Magistrate*

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding....

This Court has reviewed the entire record of the proceedings before the bankruptcy judge and finds that no matter how Cem-

**10.** Not only would a motion to withdraw be untimely, but there is also a strong argument that a motion to disqualify would be untimely as well. As already discussed, Cemco made its request for disqualification on June 6, 1986, nearly four months after the bankruptcy judge issued his memorandum opinion regarding the Bank's foreclosure and Cemco's counterclaim. *See In re Muller,* 851 F.2d 916, 919 (7th Cir. 1988) ("Rogers later proceeded to trial without objection and only raised the bias issue after [the Judge] verbally announced his ruling unfavorable to Rogers.").

co's request for disqualification is characterized—whether as a section 157(d) motion to withdraw the reference for "cause" or as a section 455 motion for disqualification—there is no reasonable basis for finding "cause" or disqualification.

Under either section 157(d) or section 455(b)(1), a bankruptcy judge's bias sufficient to constitute "cause" or sufficient to require disqualification must be a personal bias and not one arising from the judge's view of the law as applied to the case. *In re M. Ibrahim Khan, P.S.C.,* 751 F.2d at 164 (citing cases). This Court has reviewed the entire record of the proceedings before the bankruptcy judge and finds that the bankruptcy judge did not have a personal bias against Cemco. The bankruptcy judge's comments concerning counsel for Cemco's letter and other comments concerning Cemco's arguments were all made in the bankruptcy judge's consideration of the merits of Cemco's arguments. The bankruptcy court was understandably upset at counsel for Cemco's suggestion that he would be personally liable for entering an erroneous order (an order not to Cemco's liking). The bankruptcy judge was also upset at counsel for Cemco's insistence on reiterating certain arguments that the bankruptcy court had denied. It is not inappropriate for a Court to express impatience with counsel who reiterates arguments already denied and who suggests that the judge may be personally liable for his decisions. A judge need not remain silent when a lawyer makes improper or foolish arguments, and a judge need not disqualify himself when he comments on the lawyer's representation before the court. *See, e.g., Id.* at 165 ("It is not inappropriate for a court to express outrage based solely on the facts before it when the court finds that a party has abused legal process.").

Likewise, this Court finds that there is no reasonable basis in the record for finding that the bankruptcy judge was required to disqualify himself under section 455(a). Under section 455(a), a judge must disqualify himself only if there is a reasonable factual basis for doubting his impartiality. "The inquiry is objective, from the point of view of a reasonable person with access to all of the facts." *New York City Dev. Corp. v. Hart,* 796 F.2d 976, 980 (7th Cir. 1986); *see also Andersen v. Roszkowski,* 681 F.Supp. 1284, 1288–90 (N.D.Ill.1988). The Court finds that a reasonable person with access to all of the facts in this case would not question the bankruptcy judge's impartiality. Accordingly, for all the reasons discussed, the Court finds that there is no basis for finding that the bankruptcy judge had an improper bias against Cemco, *see e.g., In re M. Ibrahim Khan, P.S.C.,* 751 F.2d at 165, and therefore denies Cemco's motion to strike the proposed findings and conclusions on this ground.[11]

### III. *Specific Objections To Proposed Findings And Conclusions*

Cemco makes various objections in its voluminous memoranda entitled "Objections to Proposed Findings and Conclusions." It divides these objections into "General Objections," "Specific Objections," and "Further Objections." Most of these objections, however, are different ways of objecting to the same thing, and some of them are simply reiterations of arguments asserted in Cemco's motion to strike.

■■■ Cemco makes three basic objections that have not already been addressed by this Court on Cemco's motion to strike.[12]

---

**11.** As already noted in the discussion, Cemco has appealed to this Court the bankruptcy judge's order denying its request for disqualification, but Cemco has requested the Court to rule on its appeal in connection with its motion to strike the proposed findings and conclusions. As explained in the discussion, the Court denies Cemco's motion to strike the proposed findings and conclusions, and also affirms the bankruptcy judge's orders dated July 15 and August 18, 1986, denying Cemco's request for disqualification.

**12.** Cemco also makes other objections that are not encompassed in the three basic objections, but these objections warrant little attention. In Foreclosure Conclusion No. 15, the bankruptcy judge proposed that the Bank "is entitled to a late charge of 11% as provided in the Note." Cemco objects stating that "[t]here is no late charge of 11% in the Note that Cemco can find." Cemco's Objections to Conclusion no. 15. Cem-

First, Cemco objects to the bankruptcy judge's conclusion that the cemetery's "unused burial spaces" are subject to the Bank's mortgage, and to the subsidiary findings and conclusions that an "unused burial space" is an interest in real property, that it is a real property interest that, once conveyed to a third party, can be subject to a mortgage under Illinois law, and that Cemco is not a bona fide purchaser for value that takes free of the mortgage. Cemco Foreclosure Objections to Findings Nos. 5, 7, 8, 11–19; Conclusions Nos. 1, 9, 10, 12. Second, Cemco objects to the bankruptcy judge's finding and conclusion that Cemco assumed the cemetery's mortgage, which provides for reasonable attorneys' fees and costs incurred as the result of foreclosure proceedings, and to the finding and conclusion as to the amount of reasonable attorneys' fees and costs. Cemco Foreclosure Objections to Findings No. 10; Conclusions Nos. 5, 6, 7. Finally, Cemco objects to the bankruptcy judge's findings and conclusions that dismiss the three counts of Cemco's amended counterclaim. Cemco's Foreclosure Objections to Conclusions Nos. 12–14.

## A. *Unused Burial Spaces*

As to the first basic objection regarding whether the Bank's mortgage covers "unused burial spaces," the Court first notes that the Bank's mortgage secures the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging, and all rents, issues and profits thereof...." To avoid this language, Cemco argues that it owns the "unused burial spaces" free of the Bank's mortgage because (1) an "unused burial space" is not an interest in real property that is covered by the mortgage; (2) even if the "unused burial space" is a real property interest, it is not a real property interest that, once conveyed to a third party, can still be subject to a mortgage under Illinois law; and (3) even if the "unused burial space" is a real property interest that, once conveyed to a third party, can still be subject to a mortgage, Cemco is a bona fide purchaser that takes free of the mortgage.

As to the first argument, Cemco contends that "[t]he burial rights sold to Cemco by [the cemetery] are not interests in real property or real estate as those terms are understood in the law." Cemco

co did not look very far. The front of the Note clearly states that the note is in the amount of the Principal Sum of FOUR HUNDRED TWENTY–FIVE THOUSAND AND NO/100 DOLLARS and interest on the balance of principal remaining from time to time unpaid at the rate of eleven (11) per cent per annum ...".

The front of the Note goes on to provide: The principal of each ... instalment[ ] unless paid when due shall bear interest after maturity at the rate of 12 per cent per annum. Because the Bank did not argue in the bankruptcy court (and does not argue in this Court) that it is entitled to interest at the rate of 12 per cent, the Court does not address whether it is entitled to that 12 per cent.

In Foreclosure Conclusion No. 17, the bankruptcy court entered and continued the Bank's various motions for sanctions pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 for future determination. The bankruptcy judge apparently has reserved ruling on the motions for sanctions until this Court rules on Cemco's objections to the proposed findings and conclusions and also on Cemco's appeal from the bankruptcy judge's refusal to recuse himself. Cemco objects to the bankruptcy judge's reservation of jurisdiction, stating:

It is improper for the Bankruptcy Court to reserve jurisdiction. It has no jurisdiction after its work is done and it has transmitted its proposed findings and conclusions. Any sanctionable activity should be part of the proposed findings and conclusions, so that all matters can be determined at once.

Cemco Foreclosure Objections to Conclusion No. 17, at 32. This Court disagrees. The proposed findings and conclusions under § 157(c)(1) concern the Bank's foreclosure action and Cemco's counterclaims. Whether Cemco and/or Cemco's counsel must be sanctioned under Fed.R.Civ.P. 11 or under 28 U.S.C. § 1927 for their litigation conduct is separate from the proposed findings and conclusions. The bankruptcy court retains jurisdiction to rule on motions for sanctions for improper conduct that occurred while the bankruptcy court had the reference. Cemco also puts forth several other objections not encompassed in the three basic objections discussed in the text. The Court has examined these objections "with due care, but finds no merit in them and no reason to publish an analysis of them." *United States v. Herrera-Medina,* 853 F.2d 564, 568 (7th Cir.1988).

Foreclosure Objections to Finding No. 11. Cemco characterizes the burial rights as a license for perpetual use, and points out that "an instrument which merely gives another the right to use the premises for a specific purpose, the owner of the premises retaining possession and control thereof, does not confer an interest in the land and[,] therefore, it is not a lease, but only a license." *Id.* According to Cemco, because the burial rights are not interests in land but are only licenses for perpetual use—and because the Bank's mortgage did not include burial right licenses as collateral—Memorial Estates conveyed those rights (the burial right licenses) to Cemco free of the mortgage.

This Court disagrees. Although courts have given the property interest in a burial space a variety of labels, most of the labels recognize that a burial space is an interest in real property. As stated by one court relatively recently,

> we note that the purchaser of a cemetery lot does not acquire a fee simple interest. Rather, he obtains a qualified property right or estate that is more in the nature of an easement, license, or privilege for the exclusive use of the lot for burial purposes so long as the property remains a cemetery.

*Gallagher v. Trustees of the Cherry Hill Methodist Episcopal Church of Cherry Hill, Inc.,* 42 Md.App. 186, 399 A.2d 936, 940 (1979) (citations omitted). As stated by another court,

> the concept of "property" is an elusive one. Property law is replete with semantic problems. It is possible for the same court in the same jurisdiction within the span of a few years to give the same general type of interest in property several different labels.... However, if a functional rather than a conceptual approach is used toward property law and interests in land, it is clear that a purchaser's interest in a burial lot is a "property right" whether it be called an easement, license, right of sepulture or whatnot. Tiffany has stated:
>
>> The privilege of interring bodies in a burial ground belonging to a corpora-

tion or association has been referred to as an easement, as a usufructuary right, and as a license. However characterized, the lot holder, as he is frequently termed, even if not owner of the fee, has an interest in the lot which is such a property right as the law recognizes and protects from invasion.

*Terry v. Elmwood Cemetery,* 307 F.Supp. 369, 373 (N.D.Ala.1969) (*quoting* 3 H. Tiffany, *The Law of Real Property* § 774 (3d ed. 1939) (footnotes omitted)). And as summarized by a legal encyclopedia,

> According to the rule prevailing in nearly all jurisdictions, one who purchases and has conveyed to him a lot in a public cemetery does not acquire the fee to the soil, but only a right of burial therein which has been variously designated as an easement or a license or a privilege....
>
> Even though the purchaser of a cemetery lot may not acquire the fee simple title to the property, he has a property right in his lot which the law recognizes and protects by appropriate remedies from invasion, whether it is by a mere trespasser or by the corporation itself. He acquires an exclusive right to make internments in the lot, and a right to the free and unobstructed use of the alleys and driveways in the cemetery for the purpose of obtaining access to his lot. One who is permitted to bury his dead in a public cemetery by the express or implied consent of those in control of it acquires such a possession in the spot of ground in which the bodies are buried as will entitle him to an action against the owners of the fee or strangers who without his consent negligently or wantonly disturb it, and this right of possession will continue as long as the cemetery continues to be used. Of course, the owner of a burial lot has no right therein which can prevail against the power of the public authorities to require the discontinuance of the cemetery and the removal of bodies therefrom.

14 Am.Jur.2d *Cemeteries* § 25, at 732–34 (2d ed. 1964 & Supp.1988) (footnotes omitted).

Illinois law is consistent with these labels that recognize that a burial right is an interest in real property. Some Illinois courts refer to the burial right as an easement or other real property interest. *See, e.g., Brown v. Hill,* 284 Ill. 286, 119 N.E. 977, 980 (1918) ("Even though a purchaser [of a burial space] may not acquire a fee simple title but simply an easement ... he has a property right in his lot which the law recognizes...."); *see Mannheimer v. Wolff,* 38 Ill.App.2d 216, 221, 187 N.E.2d 1, 4 (1962); *Odd Fellows Oakridge Cemetery Assoc. v. Oakridge Cemetery Corp.,* 14 Ill.App.2d 378, 144 N.E.2d 853 (1957). *See generally* 7 Illinois Law and Practice, *Cemeteries* §§ 12, 14, 16 (1954 & Supp.1988). The bankruptcy court in this case suggests that the interest is more like a license coupled with an interest that is not terminable at will.

No matter how the property interest in a "burial right" is labelled under Illinois law, a burial right is an easement and therefore an interest in real property. Because the Bank's mortgage covers the gamut of real property interests—securing the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging"—the Court finds that the Bank's mortgage covers the valuable "unused burial spaces" that Memorial Estates attempted to convey to Cemco. It was obviously the intent of the parties, in creating the Bank's mortgage, to cover the valuable attributes of the cemetery, and "unused burial spaces" constitute its most valuable attribute.

■ Cemco next argues that, even if the "unused burial spaces" are an interest in real property, it is not an interest that is still subject to the mortgage under Illinois law once it is conveyed to a third party such as Cemco. To support its argument, Cemco relies on the common law rule which provides that purchasers for value of a burial space are not subject to the cemetery's mortgage. *See, e.g., Spear v. Locust Wood Cemetery,* 72 N.J.Eq. 821, 66 A. 1068 (1907); *Ross v. Glenwood Cemetery Ass'n,* 81 A.D. 357, 81 N.Y.S. 779 (1903).

These cases make clear that the common law rule applies only to individual purchasers of burial spaces for direct internment purposes. The rule is designed to protect the individual purchaser (consumer) and the important sentimental value attached to the burial spaces of his or her loved ones. In this case, however, Cemco is not an individual purchaser of burial space for direct internment purposes. Cemco is a corporate retailer of cemetery lots, and the purpose of the common law rule would not be furthered by extending the rule to a corporate retailer of cemetery lots under these circumstances. The Court therefore finds that the common law rule subordinating a mortgage to an individual's right to be buried in a burial space that he or she purchased for value does not apply to a corporate retailer of cemetery lots such as Cemco.

■ As its final argument, Cemco contends that it is a bona fide purchaser that takes free of the mortgage. *See Gallagher,* 399 A.2d at 940 n. 3 ("This doctrine ... is basically that 'every reasonable intendment should be made to support the titles of bona fide purchasers of real property, and that no equity can be any stronger than that of a purchaser who has put himself in peril by purchasing a title for a valuable consideration without notice of any defect in it. This protection would extend to a legal interest in real property such as a [burial right] easement.' ") (citations omitted). A bona fide purchaser "is one who, without notice of another's claim of right to, or equity in property prior to his acquisition of title, has paid vendor a valuable consideration." Black's Law Dictionary, 161 (5th ed. 1979); *see also Life Savings and Loan Ass'n v. Bryant,* 125 Ill.App.3d 1012, 1019, 81 Ill.Dec. 577, 583, 467 N.E.2d 277, 283 (1st Dist.1984) ("A bona fide purchaser is one who takes without notice of a prior claim or encumbrance.").

Cemco and the Bank spent a good deal of time in the bankruptcy court disputing whether Cemco paid valuable consideration to the cemetery for the burial spaces. However, whether or not Cemco paid valu-

able consideration, it is clear that Cemco had actual notice of the Bank's mortgage before Cemco acquired the rights to the "unused burial spaces." [13] Cemco argues that the Bank's mortgage did "not give the slightest notice of any collateral interest in the burial rights." Cemco Objections to Finding No. 10, at 27. However, as already discussed, the Bank's mortgage covered the cemetery's premises "together with all improvements, tenements, [and] easements," and therefore the mortgage covered the "unused burial spaces." Accordingly, the Court finds that Cemco was not a bona fide purchaser of the cemetery's "unused burial spaces."

### B. Cemco's Assumption of the Mortgage

■ As to Cemco's second basic objection, Cemco argues that it is not a party to the mortgage (or to the Note secured by the mortgage), that it has not assumed the mortgage, and that therefore it is not liable for any underlying indebtedness for attorneys' fees, late charges, or costs provided by the mortgage. Further, Cemco argues that, even if it has assumed the mortgage, the Bank's requested amount of attorneys' fees and costs incurred as a result of the foreclosure is unreasonable.

After giving *de novo* review of the record before the bankruptcy court, this Court determined that it would be necessary to hold a hearing to allow the parties to clarify the record and submit additional evidence on these issues. The Court has held a hearing at which time the parties submitted documentary and testimonial evidence and argued their positions with citation to legal authority.

The Bank points out that, under Illinois law, a purchaser of mortgaged property can assume the mortgage obligations (including liability for attorneys' fees and costs provided by the mortgage) either explicitly or implicitly. *See, e.g., Shiel v. Chicago Title and Trust*, 262 Ill.App. 410, 414 (1931) ("The rule is firmly established that a purchaser of mortgaged property may be held personally liable for the payment of a note secured by a mortgage provided he had expressly or implicitly agreed to assume and pay the debt."). In this case, the Bank concedes that Cemco never explicitly assumed Memorial Estates' mortgage obligations.

The Bank argues that Cemco implicitly assumed the mortgage obligations and relies on *Lange v. Bartlett*, 207 Ill.App. 422 (1917). *Lange* is one of many Illinois cases that stand for the proposition that the parties' intention governs whether the purchaser has assumed the seller's mortgage obligations. *Id.* at 424–25 ("We think the law is well-settled that where a deed of property is made subject to an existing mortgage, the words, 'subject to,' in the absence of anything in the context which would throw a light upon the intention of the parties, do not, in themselves, show an intention on the part of the grantee to assume the mortgage, and that in such a case the intent of the parties is a question of fact to be established by the evidence."); *see, e.g., Life Savings and Loan Ass'n v. Bryant*, 125 Ill.App.3d 1012, 81 Ill.Dec. 577, 467 N.E.2d 277 (1st Dist.1984); *see generally* 27 Illinois Law and Practice Mortgages § 215, at 269 (1956 & Supp. 1988) ("The intention of the parties will control in determining whether or not a contract for the sale of mortgaged real estate imposes on the grantee liability to pay the mortgage debt."). These cases hold that, where the parties' intention is not explicit and clear from their contract, then the parties' intention (may be implicit

---

13. *See, e.g.*, Transcript of Proceedings, January 21, 1986, at 90–92:

> **Q:** Now, were you aware prior to taking possession of [the cemetery] that there was an outstanding mortgage thereon to [the Bank]?
> **A [by Mr. Savage, President of Cemco]:** I certainly was.
> **Q:** Okay. And were you aware of the approximate amount of that mortgage ...?
> **A:** Yes, I was.

> **Q:** And what was that amount, sir?
> **A:** As I recollect, it was $389,000 that was due and owing at that time.
>      . . .
> **Q:** ... At any time since acquiring the premises or becoming in possession of the premises, have you reduced, paid off or in any fashion satisfied the outstanding obligation [to the Bank]?
> **A:** No, I have not.

and) may be shown through circumstantial evidence.

In *Lange,* the appellate court analyzed certain circumstantial evidence and held that the trial court correctly determined that the purchaser implicitly assumed the seller's mortgage obligations. *Lange,* 207 Ill.App. at 425–26. The court first noted that the seller testified that she told the purchaser's agent that the purchaser would have to assume the mortgage because the mortgagee was preparing to foreclose, and that the purchaser's agent testified that he did not recall any conversation regarding the assumption of the mortgage. On these facts, the court held that the trial judge "was amply justified in finding that the [purchaser] did assume the mortgage ...". *Id.* at 425. The court went on, however, to find another basis for upholding the trial court:

> But while we are of the opinion that the parol evidence fully sustains the finding as to the intent of the parties, we think it is also conclusively supported by a circumstance not referred to by counsel. The meaning of the words and phrases in an agreement is largely determined by the context. In the present contract it was agreed that the property should be conveyed "subject to" [various liens].... When ... the parties enumerated the liens that the property was "subject to" and included only those ... liens that the grantee was to be liable for, and excluded those that the grantor was to be liable for, they conclusively show that they were enumerating the items which the grantee was to assume. Among these was the mortgage in question. We are, therefore of the opinion that a proper construction of the words of the contract itself places the obligation to discharge the mortgage squarely on the appellant.

*Id.* at 425–26.

In this case, the Bank argues that the evidence "not only meets, but goes beyond the requirements set forth in *Lange* to prove that Cemco implicitly assumed the debt." CBC Statement of Position for *de novo* hearing at 6. The Bank relies on various documents and certain testimony before the bankruptcy court and this Court and argues that this evidence, taken *"as a whole,* [shows] that Cemco implicitly agreed with [Memorial Estates] to assume the mortgage owed to the Bank." CBC Reply to its Statement of Position at 10.

The Bank points to certain portions of the testimony of Bernard Savage, the President of Cemco, before the bankruptcy court, that shows that (1) before the closing of the transaction between Memorial Estates (and its parent corporation, Howard National Corporation) and Cemco, Mr. Savage was shown a preliminary title report and was thereby aware that the cemetery property was encumbered by a mortgage and note held by the bank; (2) Mr. Savage was aware that Cemco acquired Memorial Estates subject to the Bank's mortgage; and (3) the closing document entitled the Unanimous Consent of the Board of Directors of Howard National Corporation provided that the "purchaser of the cemeteries would assume all the mortgages on such properties ...".

None of this testimony, separately or taken as a whole, establishes that Cemco agreed to assume the Bank's mortgage. *See, e.g., Pearce v. Desper,* 11 Ill.2d 569, 144 N.E.2d 617 (1957) ("The words 'subject to' do not indicate an understanding that the mortgage was to be assumed."); 27 Illinois Law and Practice, *supra* at 264 ("the purchaser or grantee is not liable for the mortgage debt unless it is clear that he has expressly or impliedly assumed to pay it, and the mere recital in a conveyance that it is subject to a specified mortgage encumbrance does not constitute an assumption by the grantee ..."). The testimony of Mr. Savage before this Court is that Cemco never agreed with Memorial Estates to assume the Bank's mortgage, never agreed with the Bank to assume the mortgage, and never made any mortgage payments or otherwise acted as though it had assumed the mortgage. Mr. Savage further testified that Cemco attempted to negotiate with the Bank concerning the Bank's mortgage on the cemetery property but that Cemco and the Bank were unable to reach an agreement.

The Court finds Mr. Savage's testimony credible and also finds that his testimony is supported by the various documents in evidence, as well as the actions of the parties. None of the documents indicates that Cemco agreed to assume the Bank's mortgage. At best, these documents indicate that Cemco was negotiating with the Bank regarding the cemetery's mortgage debt. One of the documents, entitled Amendment to Agreement in Principle Dated November 15, 1981, amended the buy/sell Agreement in Principle concerning the transaction between Memorial Estates and Cemco, and provided:

¶ 5. *Documents to be Obtained by Mutual Best Efforts of the Parties.* Howard [Howard National Corporation, as parent of Memorial Estates], its cemetery subsidiaries and CEMCO shall use their mutual best efforts to obtain the following documents:

(a) release of all personal guarantees of John Karras or any other officer or director of Howard or any of its cemetery subsidiaries given in connection with any collateral assignment of beneficial interest of any real property the beneficial interest of which is owned by Howard or any of its subsidiaries and used for cemetery or mausoleum purposes;

. . . . .

(c) Release of all collateral assignments of beneficial interest executed by Howard or any of its cemetery subsidiaries pertaining to any trust holding title to any of the realty to be transferred hereunder; . . . .

This document establishes that Cemco agreed to use its "best efforts" to obtain a release for Memorial Estates of its mortgage obligations with the Bank. The release could only be obtained by retiring the mortgage or by Cemco assuming the mortgage obligations, but Cemco never obtained the release and the mortgage never was retired. Further, nowhere in the document is there any mention of Cemco's assumption of Memorial Estates' mortgage obligations, and the Bank has not produced a later document that shows that it successfully negotiated with Cemco to assume the mortgage. The document only shows that Memorial Estates and Cemco agreed that Cemco would use its "best efforts" to obtain a release for Memorial Estates, and such a release was never obtained.

After a *de novo* review of all the evidence submitted to the bankruptcy court and before this Court, and after weighing the credibility of the witnesses, the Court finds that the Bank has failed to prove that Cemco assumed the cemetery's mortgage obligations.

The Court's finding therefore makes it unnecessary to review *de novo* the amount of Cemco's liability for attorneys' fees and costs incurred as a result of the Bank's foreclosure. The Court finds, however, that it is still necessary to determine the amount of attorneys' fees and costs to be awarded against the mortgagor, Memorial Estates. The record merely contains ledger statements from the Bank with the sum total amounts that it has paid to various law firms and accounting firms up to a certain date. The record is not sufficiently detailed for this Court to determine whether these fees and costs are reasonable. Further proceedings to determine fees and costs were contemplated. The Court, therefore, refers the matter back to the bankruptcy court for a final determination of attorneys' fees and costs as it completes the foreclosure proceedings.

### C. *Cemco's Counterclaims*

As to Cemco's final basic objection, Cemco argues that the bankruptcy court improperly dismissed its three counterclaims. In Count I of the Amended Counterclaim, Cemco claims, *inter alia*, that it owns the exclusive right to the information contained in the cemetery's books and records and that the books and records are not subject to the Bank's foreclosure. Again, after *de novo* review of the record before the bankruptcy court, this Court held a hearing to allow the parties to clarify the record, submit additional evidence, and argue their positions with citation to legal authority.

The Bank makes two arguments that Cemco does not own the exclusive right to

the information contained in the cemetery's books and records. First, the Bank argues that Illinois law prevents it, and second, that an agreement between the Bank and Memorial Estates precludes it.

■ As to the first argument, the Bank relies on various provisions of the Cemetery Care Act, Ill.Ann.Stat. ch. 21 para. 64.1 *et seq.* (Smith–Hurd 1972 & Supp. 1988). Under Illinois law, the creation, operation, and removal of a cemetery is carefully regulated, and the Bank relies in particular on the regulation that requires the owner of a cemetery to keep accurate books and records so as to "enable the [state] to determine whether [the owner] is complying with the provisions of [the Cemetery Care Act]." Ill.Ann.Stat. ch. 21, para. 64.13 (Smith–Hurd Supp.1988).

Cemco argues that this requirement applies only to care fund transactions and "does not require the [owner] to retain records of prior care fund transactions, or other transactions, in which the [owner] has had no part." Cemco Response to Statement of Position at 2. This Court disagrees. The Cemetery Care Act requires the owner of a cemetery to keep accurate books and records of all of the cemetery's transactions regarding burial space ownership, transfers and burials. *Id.*, para. 64.2 (Smith–Hurd Supp.1988). If Cemco were able to purchase the exclusive right to the information contained in the cemetery's books and records, the Bank and/or the purchaser at the foreclosure sale would be unable to maintain the information required by the Cemetery Care Act. The Court therefore rules that the Cemetery Care Act and Illinois public policy prevents a party from owning the exclusive right to the information contained in the cemetery's books and records without also owning or operating the cemetery.

■ Although it is unnecessary for the Court to reach the Bank's second argument, the Court notes that this argument also would prevent Cemco from owning the exclusive right to the information contained in the cemetery's books and records. Pursuant to the Trust Deed Agreement between Memorial Estates and the Bank, the parties executed a document entitled Assignment of Rents. The document provided that in the event of any default on the Note secured by the mortgage, the Bank

> may with or without process of law, and without any action on the part of the holder or holders of the indebtedness secured by said trust deed, enter upon, take, and maintain possession of all or any part of said real estate and premises hereinabove described, together with all documents, books, records, papers, and accounts of [Memorial Estates].

Assignment of Rents, p. 2. The Court finds that this security agreement between Memorial Estates and the Bank precludes Cemco from purchasing the exclusive right to the information contained in the cemetery's books and records. Memorial Estates defaulted on the Bank's note *before* the attempted transfer of the books and records to Cemco. Therefore, under the terms of the Assignment of Rents, the default triggered the Bank's absolute right to the possession of the cemetery's books and records. The Bank's lien on the books and records was never released, and Cemco was aware of Memorial Estates' title report which contains the Assignment of Rents. Accordingly, on this additional basis, the Court finds that Cemco does not own the exclusive right to the information contained in the cemetery's books and records, and the bankruptcy court correctly proposed that this Court deny Count I of Cemco's Amended Counterclaim.

■ In Count II of the Amended Counterclaim, Cemco claims that it should be compensated for maintaining and improving the cemetery. It claims that the Bank will be unjustly enriched if Cemco is not "compensated for its losses in maintaining the status quo and for improving the property." Amended Counterclaim, Count III, ¶ 6; Cemco Foreclosure Objections to Conclusion No. 13, at 30. The bankruptcy court correctly found that there is no provision in the Note or mortgage that entitles a third party to compensation for maintaining the cemetery. Cemco has not proved that it was properly in possession of and operating the cemetery. The bankruptcy

court therefore correctly proposed that this Court deny Cemco's claims for compensation on the theory of unjust enrichment. Moreover, Cemco admits that it received at least $400,000 in gross fees for providing services and selling merchandise at Memorial Estates during the period that it operated the cemetery. Cemco has never tendered or accounted for these amounts to the Court, the bankruptcy estate, or the Bank. Therefore, Cemco's claim for compensation on the theory of unjust enrichment is denied.

■ In Count III of the Amended Counterclaim, Cemco claims that the Bank should be liable for certain of the cemetery's merchandising obligations (e.g., tombstones, vaults, and a mausoleum). Cemco claims that the obligations extend to approximately 3,100 customers in the amount of $1,200,000, and an obligation to build a mausoleum in the amount of $250,-000. As the bankruptcy court found, however, the Bank has never been a party to any of these merchandising obligations, it claims no interest in these contracts, and it does not seek to enforce any rights that have any effect on these contracts. Cemco has put forth no legal basis for holding the Bank liable for these consumer obligations. Accordingly, the bankruptcy court correctly proposed that this Court deny Cemco's claim that the Bank is liable for the merchandising obligations.

### IV. *Findings and Conclusions*

After a *de novo* review of the bankruptcy court record including the exhibits, and in particular the record of the trial of the Bank's foreclosure, and Cemco's counterclaims, and the evidence submitted during the hearing before this Court, the Court hereby adopts in part the bankruptcy court's proposed findings of fact and conclusions of law and, in addition to the foregoing, makes its own specific findings of fact and conclusions of law, as follows.

### A. *Jurisdictional Findings*

1. The Court has jurisdiction over this foreclosure action pursuant to 28 U.S.C. § 1334(b) on the ground that the action is related to a case under Title 11. Under 28 U.S.C. § 157(a), the Court properly referred the "related" foreclosure case to the bankruptcy court, and, under section 157(c)(1), the bankruptcy court properly proposed findings and conclusions to this Court. The Court has now given *de novo* review of those matters contained in the proposed findings and conclusions to which a party has timely and specifically objected.

2. Each of the defendants has been properly served by Service of Summons or Publication, and proper notice has been given to each of the defendants during the progress of the foreclosure proceedings. The Court has jurisdiction over all of the defendants to this "related" foreclosure case.

3. As provided by the Illinois Mortgage Foreclosure Law, Ill.Ann.Stat. ch. 110, para. 15–1603 (Smith–Hurd Supp.1988), the period for redeeming the property from a foreclosure sale is "60 days after the date the judgment of foreclosure is entered, if either: ... (2) the Court finds in the judgment that the mortgaged real estate has been abandoned." Neither the mortgagor nor anyone claiming an interest under it is occupying the mortgaged real estate. The Court therefore finds that the mortgaged real estate has been abandoned and that the redemption period in this case shall expire sixty days from the date of the foreclosure judgment.

### B. *Evidentiary Findings*

4. The Chicago Bank of Commerce ("Bank") filed a complaint to foreclose a trust deed ("mortgage") on cemetery property known as Memorial Estates, Inc. ("cemetery"). The Bank is the owner of a promissory note ("Note"), made on May 27, 1978, in the original amount of $425,000. This Note was executed by the Amalgamated Trust and Savings Bank ("Amalgamated") as trustee under a Land Trust Agreement dated September 27, 1974, and known as Trust No. 2744. The Note was also executed by the cemetery as co-maker.

5. The Note was secured by a Trust Deed, also made on May 27, 1978, and executed by Amalgamated as land trustee.

The Trust Deed names the Chicago Title and Trust Company as trustee, and the Trust Deed was properly recorded in the Office of the Cook County, Illinois Recorder of Deeds on May 18, 1978, as Document No. 24454133. Both the Note and the Trust Deed were identified by the Chicago Title and Trust Company with the number 627426. At the time of execution of the Note and Trust Deed, the cemetery was the sole beneficiary of Amalgamated Land Trust No. 2744. Amalgamated, as land trustee, was and remains the legal owner of the cemetery's real property.

6. The legal description of the real property consigned by the Trust Deed is as follows:

The South half (except the West 80 feet thereof) of the South East quarter of Section 30, Township 40 North, Range 12, East of the Third Principal Meridian, in Cook County, Illinois and excepting that part beginning at the intersection of a line which is 50 feet North of and parallel with the South line of said South West quarter of the South East quarter with a line which is 80 feet East of and parallel with the West line of said South West quarter of the South East quarter; thence East along said line which is 50 feet North of and parallel with the South line of said South West quarter of the South East quarter, a distance of 1153.76 feet; thence North along a line which forms an angle of 89 degrees, 24 minutes, 20 seconds, (measured clockwise) with the last described course, a distance of 123.33 feet to a point of curve; thence North Westerly along a curve, concave Westerly and having a radius of 151.66 feet, a distance of 45.70 feet, thence North Westerly along a line tangent to the last described curve, a distance of 103.36 feet, to a point of curve; thence North Westerly along a curve, concave Westerly and having a radius of 138.97 feet, a distance of 31.86 feet; thence North Westerly along a line tangent to the last described curve, 162.59 feet to a point of curve; thence Northerly along a curve, concave Easterly and having a radius of 203.82 feet, a distance of 73.20 feet; thence North Westerly along a line tangent to the last described curve, a distance of 152.34 feet to a point of curve; thence North Easterly along a curve, concave Easterly and having a radius of 262.67 feet, a distance of 361.82 feet; thence North Westerly along a line forming an angle of 82 degrees, 32 minutes, 30 seconds, (measured clockwise) with the chord of the last described curve, a distance of 241.32 feet; thence North Easterly along a line forming an angle of 287 degrees, 14 minutes, 30 seconds, (measured clockwise) with the last described course, a distance of 304.-19 feet to the North line of said South West quarter of the South East quarter of Section 30; thence West along the North line of said South West quarter of the South East quarter a distance of 1098.25 feet to a point which is 80 feet East of and parallel with the West line of said South West quarter of the South East quarter; thence South along a line which is 80 feet East of and parallel with the West line of said South West quarter of the South East quarter to the place of beginning, all in Cook County, Illinois. Permanent Tax No. 12–30–402–047. Commonly known as: 900 Wolf Road, North Lake, Illinois.

7. The Trust Deed provided that, to secure payment of the Note, Amalgamated as land trustee does "grant, remise, release, alien and convey" to the Bank, under the Trust Deed, the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging." As additional security for the Note, the Bank also holds an assignment of the beneficial interest in Amalgamated's Trust No. 2744.

8. On November 15, 1981, the cemetery conveyed to Cemco, Inc. ("Cemco") by certificates of title numbers 9847 through 9911, all of its interest in the perpetual use and occupancy for exclusive burial rights "[a]ll spaces of Lot Nos. 3–7–9–23–24 in Garden of Devotion Section No. 1, containing all estates...." By separate document, the cemetery assigned the beneficial interest in Trust No. 2744 to First Western . Company as agent of Cemco, a

corporation which was organized subsequent to the attempted assignment. The Bank has not approved the assignment of the beneficial interest in the land trust as required by the Note and Trust Deed agreement with Amalgamated and the cemetery, and Amalgamated has not accepted the assignment.

9. The cemetery conveyed to Cemco the cemetery interest in all "unused burial spaces" of Lot Nos. 3–7–9–23–24 in Garden of Devotion Section No. 1, containing all estates and the beneficial interest in Trust No. 2744 in exchange for Cemco's agreement to assume, among other things, certain of the cemetery's consumer obligations and Cemco's "best efforts" to obtain a release for Memorial Estates of its obligations under the Trust Deed. Cemco agreed to provide no further consideration. Cemco did not obtain a release for Memorial Estates of its Trust Deed obligations, and Cemco never agreed to assume Memorial Estates' Trust Deed obligations.

10. At the time of the conveyance to Cemco, Cemco's president Bernard Savage and Cemco's parent corporation First Western Company knew that the cemetery had previously conveyed the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging" by the Trust Deed to secure the Bank's Note in the amount of $425,000.

11. Cemco has not made any payments under the Note, and has taken the position that the "unused burial spaces" are not covered by the Trust Deed and are not security for the Bank's Note. On July 15, 1982, the Bank brought a foreclosure action against Memorial Estates, Cemco, and other defendants on the Trust Deed in the Circuit Court of Cook County. The Note secured by the Trust Deed had been in default since April 2, 1981. At all times pertinent to the foreclosure proceedings, the Bank has been the owner of the Note.

12. The amount of indebtedness under the Note which is secured by the Trust Deed is as follows:

| Principal Balance | Interest to 5/16/85 | Late Charges | Attorneys' Fees and Costs |
|---|---|---|---|
| $389,170.71 | $265,890.09 | $48,343.63 | [Not available] |

The Court is unable to determine the amount of reasonable attorneys' fees and costs incurred by the Bank as a result of the foreclosure proceedings.

13. Soon after the Bank brought its foreclosure action in the Circuit Court of Cook County, the Bank moved for the appointment of an equity receiver to operate the cemetery pending the foreclosure action. The Circuit Court entered an order on January 19, 1983, stating that the Bank was entitled to an equity receiver, which it intended to appoint on January 24, 1983. Upon entry of this order, the cemetery filed for bankruptcy, and the foreclosure action was properly removed to the federal district court pursuant to 28 U.S.C. § 1334 and properly referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). After an evidentiary hearing, the bankruptcy court determined that an equity receiver for the cemetery should be appointed and make that recommendation to the district court pursuant to 28 U.S.C. § 157(c)(1). After a *de novo* review, the district court agreed, and on January 7, 1985, issued an order appointing the equity receiver to operate the cemetery pending the foreclosure action. The Seventh Circuit affirmed the appointment in *In re Memorial Estates, Inc.*, 797 F.2d 516 (7th Cir.1986).

14. The Federal Deposit Insurance Company ("FDIC") has moved for an order directing the equity receiver to issue deeds for burial spaces to certain individual purchasers. On July 26, 1979, the FDIC entered into a Contract Purchase Agreement with the sole shareholder of the cemetery, Howard National Corporation. Pursuant to the Agreement, the FDIC acquired Howard National Corporation's right to receive certain payments due under retail installment contracts with consumers for the purchase of certain burial rights in burial spaces in the cemetery. Each of the contracts involved a sale of memorials, rights in internment, or other burial rights.

15. The FDIC has submitted to the bankruptcy court an amended list of the consumers who have fully satisfied their

payment obligations under the contracts. None of these consumers has received a deed that evidences his or her interest in a cemetery burial space, memorial, or other burial right in the cemetery. The FDIC seeks an Order directing the equity receiver to issue to each consumer a deed that evidences the interest in whatever particular burial right has been purchased and fully paid for.

C. *Conclusions*

16. The Bank has proved each and every element of its complaint to foreclose its Trust Deed ("mortgage") on the cemetery property formally known as the Memorial Estates Cemetery and now known as Fairview Memorial Park.

17. Each of the defendants has been properly served by Service of Summons or Publication, and proper notice has been given to each of the defendants during the progress of the foreclosure proceedings. The defendant Amalgamated Trust and Savings Bank, as Trustee under Trust Agreement dated September 27, 1974, and known as Trust No. 2744, filed its appearance on August 19, 1982, but did not file an answer. An order of default was entered against this defendant on November 9, 1983. The defendants Chicago Title and Trust Company, as trustee under Trust Deed recorded as Document No. 24454133, "Unknown Owners," and non-record claimants, have not filed their appearances or answers to the foreclosure complaint. An order of default was entered against these defendants on November 9, 1983.

18. The material allegations in the Bank's Amended Complaint are true substantially as set forth, and the equities in this case are with the Bank. The Bank is entitled to the relief prayed for in its complaint, including foreclosure of the Trust Deed upon the real estate described therein in the amount of the total balance due on the Note, as found in Section II, para. 12 of these findings and conclusions. Cemco has not assumed Memorial Estates' Trust Deed obligations, and is not liable for a deficiency or for attorneys' fees and costs as provided by the Note and Trust Deed. The Note and Trust Deed provide that reasonable attorneys' fees are to be included in the costs secured by the described cemetery real property. Based on the record before this Court, the Court finds that it is unable to determine the fair, reasonable, and proper attorneys' fees and costs to be allowed to the Bank in the foreclosure proceeding. Accordingly, the Court refers this case back to the bankruptcy court for further findings and conclusions as to attorneys' fees and costs in connection with the completion of the foreclosure proceedings.

19. Cemco's affirmative defenses present no defense to the Bank's foreclosure action. The Trust Deed held by the Bank securing the Bank's Note covers the "unused burial spaces" that the cemetery attempted to assign to Cemco. The common law allows an individual who purchases a burial space for internment purposes to take title free of the underlying mortgage or trust deed. The common law rule, however, does not apply to a corporate retailer of burial spaces who purchases for profit. Cemco, moreover, is not a bona fide purchaser of the "unused burial spaces." Cemco had knowledge that the Bank's Trust Deed secured the cemetery "premises" together with "all improvements, tenements, easements, fixtures and appurtenances thereto belonging."

20. The Bank's Trust Deed is not superior to and does not cover the burial spaces that have been sold to bona fide purchasers for internment or to an eleemosynary or fraternal association solely for resale to its membership.

21. The period of redemption will expire sixty days after the judgment of foreclosure is entered pursuant to Ill.Ann.Stat. ch. 110, para. 15–1603 (Smith–Hurd Supp. 1988).

22. Judgment is entered against Cemco on its Amended Counterclaim Count I claiming the exclusive right to the cemetery's books and records. The Illinois Cemetery Care Act, Ill.Ann.Stat. ch. 21, para. 64.13 (Smith–Hurd 1972 & Supp.1988), requires that the owner of a cemetery keep accurate books and records so as to "en-

able the [state] to determine whether [the owner] is complying with the provisions of the [Act]." The Court finds that this requirement prevents Cemco from owning the exclusive right to the information contained in the cemetery's books and records and denying the Bank and/or the purchaser at the foreclosure sale access to the information. The Court further finds that, in connection with the Trust Deed Agreement, Memorial Estates and the Bank executed a document entitled Assignment of Rents, which gives the Bank a first lien on the cemetery's books and records. Therefore, for this additional reason, the Court enters judgment against Cemco on its Amended Counterclaim Count I.

23. Judgment is entered against Cemco on its Amended Counterclaim Count II seeking compensation for maintaining and operating the cemetery. There is no provision in the Note or Trust Deed that entitles Cemco to compensation for maintaining or operating the cemetery. Cemco had knowledge of the Bank's Trust Deed security interest in the cemetery premises and took possession subject to the Bank's security interest. The Bank opposed the actions of Cemco and has not been unjustly enriched by Cemco's operation of the cemetery.

24. Judgment is entered against Cemco on its Amended Counterclaim Count III seeking to impose an obligation on the Bank to assume certain of the cemetery's consumer obligations is denied. Cemco has pointed to no basis for holding the Bank liable for the cemetery's consumer obligations.

25. George T. Sharpen has been properly appointed equity receiver of the cemetery pending the foreclosure proceedings. The FDIC has submitted the names of certain of the cemetery's consumers who satisfied all requirements for becoming the owner of the burial rights and other rights in the cemetery. Cemco has not put forth any valid reason to prevent these consumers from receiving a deed or other instrument evidencing the consumers' ownership. Therefore, the Court hereby directs the receiver in equity to issue deeds forthwith to the bona fide purchasers of burial rights

whose names have been submitted by the FDIC to the bankruptcy court.